# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELSEVIER INC., ELSEVIER B.V., ELSEVIER LTD.

                         Plaintiffs,

      v.

SCI-HUB d/b/a WWW.SCI-HUB.ORG, THE LIBRARY GENESIS PROJECT d/b/a LIBGEN.ORG, ALEXANDRA ELBAKYAN, JOHN DOES 1-99,

                      Defendants.

Index No. 15-cv-4282

---

## MEMORANDUM OF LAW IN SUPPORT OF IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS ON DEFENDANTS AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

I.  STATEMENT OF FACTS ........................................................................................ 3

    A.  Elsevier's ScienceDirect Platform ................................................................ 3

    B.  Remote Access to ScienceDirect .................................................................. 4

    C.  Defendant Library Genesis Project's Infringing Conduct ............................ 5

    D.  Library Genesis Project Mirrors ................................................................... 8

    E.  Defendant Sci-Hub's Unauthorized Access to ScienceDirect and Infringing Conduct ........................................................................................................ 8

    F.  Sci-Hub's Cooperation with the Library Genesis Project's Infringements ............ 10

    G.  Alexandra Elbakyan's Operation of Sci-Hub .............................................. 11

II.  ARGUMENT ........................................................................................................... 12

    A.  Plaintiffs are Entitled to a Preliminary Injunction Enjoining Defendants' Infringing Acts and Disabling Defendants' Domain Names .............................................. 13

        1.  Elsevier is Likely to Succeed in its Copyright Claims against Defendants ..... 14

        2.  Elsevier is Likely to Succeed in its CFAA Claim against Sci-Hub ................ 15

        3.  Defendants' Conduct Causes Irreparable Harm to Elsevier ........................... 16

        4.  The Balance of Hardships Tips Decidedly in Plaintiff's Favor ...................... 19

        5.  Disabling Defendants' Domain Names and Issuing a TRO and Preliminary Injunction Will Serve the Public Interest ...................................................... 21

        6.  An Injunction Disabling Defendants' Domains Can Avoid Further Irreparable Harm to Elsevier ......................................................................................... 23

        7.  The All Writs Act Authorizes the Court to Direct Registrars to Disable Defendants' Domain Names ........................................................................... 24

    B.  Plaintiffs Should Be Permitted to Serve Defendants By E-mail ............................. 26

CONCLUSION ....................................................................................................................... 32

TABLE OF AUTHORITIES

**Cases**

*Advanced Aerofoil Technologies, AG v. Todaro*, No. 11 CIV. 9505, 2012 WL 299959,

at *1 (S.D.N.Y. Jan. 31, 2012) ........................................................................ 31

*AllscriptsMisys. LLC v. Am. Digital Networks, LLC*, 2010 U.S. Dist. LEXIS 4450, *3

(D. Md. 2010) ..................................................................................................... 29

*Arista Records LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) ............................ 14

*Arista Records LLC v. Lime Wire LLC*, No. 06 CIV. 05936, 2010 WL 10031251, at *3

(S.D.N.Y. Aug. 9, 2010) .............................................................................. 17, 18

*Branch v. Ogilvy & Mather Inc.*, 772 F.Supp. 1359, 1364 (S.D.N.Y. 1991)........................... 18

*Chanel v. Liu Ling*, No. 10-cv-489 (E.D. Va. Oct. 7, 2010) ................................... 24

*Chanel, Inc. v. He Zhizhong*, No. 09-2818, 2010 WL 985195, at *2 (W.D. Tenn.

March 16, 2010) ................................................................................................. 29

*Chanel, Inc. v. Zhibine*, No. 2:09-cv-02835, 2010 WL 1009981, at *4 (W.D. Tenn.

March 17, 2010) ................................................................................................. 29

*Chanel, Inc. v. Zhixian*, No. 10-CV-605852010, WL 1740695, at *3 (S.D. Fla. April

29, 2010) ............................................................................................................. 29

*Citibank, NA v. Citytrust*, 756 F.2d 273, 274 (2d Cir. 1985) ................................. 16

*Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07 CIV. 9580 (HB), 2008

WL 594773, at *2 (S.D.N.Y. Mar. 5, 2008)...................................................... 20

*Ehrenfeld v. Salim a Bin Mahfouz*, No. 04 CIV. 9641, 2005 WL 696769, at *2

(S.D.N.Y. Mar. 23, 2005)....................................................................... 27, 28, 31

*Elsevier v. Kozlov*, No. 14-cv-2422 (S.D.N.Y. April 13, 2015) ............................ 24

i

*Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, No. 03 CIV. 8554, 2005 WL
1123755, at *4 (S.D.N.Y. May 11, 2005) ............................................... 28, 31

*F.T.C. v. PCCare247 Inc.*, No. 12 CIV 7189 , 2013 WL 841037, at *2 (S.D.N.Y. Mar.
7, 2013)......................................................................................................... 27

*Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 149 (2d
Cir.1999)) .................................................................................................... 20

*Getty Images (US), Inc. v. Microsoft Corp.*, No. 14-cv-7117, 2014 WL 5285697, at *3
(S.D.N.Y. Oct. 16, 2014)............................................................................. 13

*GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 265 (S.D.N.Y. 2012) ..................... 27, 28

*GMA Accessories, Inc., v. Megatoys, Inc.*, No. 01 Civ. 12743(LAK), 2003 WL 193507
(S.D.N.Y. Jan. 14, 2003) ............................................................................ 28

*Grokster*, 518 F.Supp.2d at 1217 ....................................................................... 18

*ICN Pharmaceuticals*, 2 F.3d 484, 490 (2d Cir. 1993) .......................................... 20

*Int'l Telemedia Associates*, 245 B.R. 713, 722 (N.D. Ga. 2000) ............................ 29

*Jian Zhang v. Baidu.com, Inc.*, 293 F.R.D. 508, 511-12 (S.D.N.Y. 2013);.......................... 28

*KPN B.V. v. Corcyra D.O.O.*, No. 08 CIV. 1549 (JGK), 2009 WL 690119, at *1
(S.D.N.Y. Mar. 16, 2009)............................................................................ 28

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265 F.R.D. 106, 115
(S.D.N.Y.2010) ........................................................................................... 28

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1217
(C.D. Cal. 2007) ......................................................................................... 17

*Microsoft v. Does*, No. 13-cv-139 (E.D. Va. Jan. 31, 2013)................................... 24

*MONY Group, Inc. v. Highfields Capital Mgmt, L.P.*, 368 F.3d 138, 143 (2d Cir. 2004)....... 20

*Morris v. Business Concepts, Inc.*, 259 F.3d 65, 70 (2d Cir. 2001), 17 U.S.C. § 201(d)(2)........................................................................................................................ 14

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ......................... 26

*Nat'l Equip. Rental, Ltd. V. Szukhent*, 375 U.S. 311 (1964).................................................... 30

*Pearson Educ. Inc. v. Nugroho*, No 08-cv-8034 (S.D.N.Y. Oct. 10, 2013) ........................... 24

*Philip Morris USA Inc. v. Veles Ltd.*............................................................................... 26, 27

*Phillip Morris USA, Inc. v. Otamedia, Ltd.*, 331 F.Supp. 2d. 228, 247 (S.D.N.Y. 2004) ....... 24

*Popular Enterprises LLC v. Webcom Media Group. Inc.*, 225 F.R.D. 560, 563 (E.D. Tenn. 2004) ....................................................................................................................... 29

*Prediction Co. LLC v. Rajgarhia*, No. 09 CIV.7459, 2010 WL 1050307, at *2 (S.D.N.Y. Mar. 22, 2010)..................................................................................................... 31

*Rio Properties, Inc. v. Rio Int'l. Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) ................... 27

*S. African Apartheid Litig.,* 643 F.Supp.2d 423, 433 (S.D.N.Y.2009) ................................... 27

*S.E.C. v. Antisevic,* No. 05 CV 6991(KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009)....................................................................................................................... 27

*Salinger v.* Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) .......................................................... 13

*See Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 738 (S.D.N.Y. 1993).................................. 20

*Sonoma Inc. v. Friendfinder Inc.*, No. C06-06572 JSW, 2007 WL 1140639, at *1 (N.D. Cal. Apr. 17, 2007)........................................................................................................ 29

*United States v. Lebanese Canadian Bank,* 285 F.R.D. 262, 266 (S.D.N.Y.2012) ................ 27

*United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) ............................................... 25

*Williams v. Advertising Sex LLC*, 231 F.R.D. 483, 488 (N.D. West Va. 2005)....................... 29

*Williams-Sonoma Inc. v. Friendfinder Inc.*, No. C06-06572, 2007 WL 1140639, at *2

    (N.D. Cal. Apr. 17, 2007)........................................................................... 31

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).................................. 13

*WPIX Inc. v. ivi Inc.*, 765 F.Supp.2d 594, 601 (S.D.N.Y. 2011) ........................................... 13

## Statutes

17 U.S.C. § 106 ........................................................................................................................ 4

17 U.S.C. § 504(c)(2) ............................................................................................................ 18

18 U.S.C. § 1030(a)(2)(C).................................................................................................... 15

18 U.S.C. § 1030(a)(4) .......................................................................................................... 15

18 U.S.C. § 1030(e)(2)(B)..................................................................................................... 15

18 U.S.C. § 1030(g) ................................................................................................... 12, 13, 15

28 U.S.C. § 1651(a) ............................................................................................................... 25

## Rules

All-Writs Act, 28 U.S.C. § 1651……………………………………………………....12

Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g)…………………………………12, 13

Fed. R. Civ. P. 65(a) ............................................................................................................. 1

Federal Rule of Civil Procedure 65(b)................................................................................. 12

Plaintiffs Elsevier Inc., Elsevier B.V., and Elsevier Ltd. (together "Plaintiffs" or "Elsevier") respectfully submit this memorandum of law in support of their Application for an Order Authorizing Alternative Service of Process and Order to Show Cause for Preliminary Injunction, and Order Transferring Domain Names, brought pursuant to Fed. R. Civ. P. 65(a) and the Copyright Act, Title 17 United States Code § 502, against defendants Sci-Hub, Library Genesis Project, and Does 1-99.

## PRELIMINARY STATEMENT

The piracy of written materials is an extremely pervasive problem for the publishing industry in the Internet age. The ease by which infringers, acting under the cloak of anonymity afforded them on the Internet, are able to obtain, copy, store, and distribute copyrighted works has resulted in an explosion in the number and scope of online piracy operations. These pirates act with impunity, infringing on the intellectual property rights of publishers while operating largely in nations where they believe themselves to be immune from the remedies provided for by American and International law. Moreover, their use of anonymization services to hide their true identities when registering websites and acceptance of difficult or impossible to track methods of payment has allowed these criminals to monetize their unlawful activities.

This action relates to Elsevier's discovery of a piracy operation more expansive and sophisticated than any it has ever before encountered. Defendants' scheme has already resulted in the widespread piracy of tens of millions of works published by Elsevier and other scientific publishers, and, if not prevented from doing so, will continue to expand in scope.

Through their websites, Defendants have engaged in the systematic copying and distribution of copyrighted scientific articles and book chapters published by Elsevier and a broad range of other science and medical publishers. The scale of the Defendants' operation is simply staggering – according to Defendants' own statements, they have already unlawfully duplicated nearly 40 million technical works and continue to acquire such content at a rate of more than 1 million works per month.

Defendants' actions are not only civil wrongs, but constitute criminal offenses as well. In addition to criminal copyright infringement and unauthorized computer access in violation of the Computer Fraud and Abuse Act, Defendants' conduct also likely violates Title 18, United States Code, Sections 1029 (fraud and related activity in connection with access devices), 2 (aiding and abetting) and 371 (conspiracy).

Plaintiffs now apply for a Preliminary Injunction in order to prevent the irreparable harm which will otherwise occur prior to a ruling on the merits of this case. Defendants' actions cause severe injury to Elsevier (and the entire scientific publishing industry) not only through the rampant piracy of copyrighted materials, but also through the persistent unauthorized intrusion into protected computers Elsevier uses to provide the ScienceDirect platform to its authorized users. Moreover, since that persistent unauthorized intrusion originates through the "hijacking" of the protected computer systems of the world's academic institutions, an injunction will protect these institutions from Defendants' unauthorized access to and use of their systems and accounts (well beyond just Elsevier's ScienceDirect), as well as the possible introduction of malware or means for identity theft or other crimes.

In addition, an injunction will also help protect the public from the Defendants' rogue, "un-curated" database. Absent efforts to prevent the continued growth and dissemination of Defendants' database, when the scientific record is corrected (through standard industry practices for retraction and correction), scientists, doctors, and researchers who use Defendants' sites will in many cases continue to rely on "bad science."

Plaintiffs respectfully submit that an order allowing service of process, and all subsequent pleadings and discovery, via e-mail in this case will benefit all parties and the Court by ensuring Defendant received immediate notice of the pendency of this action and by allowing this action to move forward expeditiously. Absent ability to serve Defendants by e-mail, Elsevier will almost certainly be left without the ability to pursue a remedy.

## I. STATEMENT OF FACTS

### A. Elsevier's ScienceDirect Platform

Elsevier is the world's leading publisher of scientific, technical, engineering, and medical ("STEM") publications, distributing more than 2,500 scientific journals and more than 33,000 books in the STEM fields.[1] One way in which Elsevier distributes these publications is through its Internet-based "ScienceDirect" platform, which is accessible through the Web at www.sciencedirect.com.[2] Through ScienceDirect, professional and educational users can access more than 33,000 books and approximately 12.3 million journal articles in the STEM fields, either by a-la-carte purchases or through institutional subscriptions.[3] Elsevier owns the copyright in a substantial portion of the publications available through ScienceDirect and is the

---

[1] Declaration of Paul F. Doda, Esq., dated May 6, 2015 ("Doda Decl.") ¶ 4.

[2] *Id.* ¶ 5.

[3] *Id.*

exclusive licensee of the copyright in the majority of the works available through ScienceDirect to which it does not own the copyright.[4]  As a regular business practice, Elsevier obtains federal registrations protecting its copyrights in the publications it distributes through ScienceDirect.[5]

Educational institutions, and particularly large research universities, are often subscribers to ScienceDirect.[6]  Through these subscriptions, a university's faculty and students have access to a substantial portion of the world's published scientific knowledge and can use those materials to further their research and studies.[7]  In many cases, the terms of a university's ScienceDirect subscription will allow for unlimited access to the platform by authorized faculty and students.[8]

In order to facilitate efficient operation of the platform, the STEM content available on ScienceDirect is stored on and transmitted through a distributed network of computer servers.[9]  Through the use of this network, users are often able to access scientific materials on a server which is physically near to the user's location.[10]

**B.    Remote Access to ScienceDirect**

Students and faculty often desire to conduct scientific research from locations other than those physically on the campus of a university.  In order to accommodate this,

---

[4] *Id.* ¶ 6.

[5] *Id.* ¶ 7.

[6] Declaration of Anthony Woltermann, dated June 10, 2015 ("Woltermann Decl.") ¶ 6-7.

[7] Doda Decl. ¶¶ 4-5.

[8] Woltermann Decl. ¶ 59.

[9] *Id.* ¶¶ 8-9.

[10] *Id.* ¶ 9.

Elsevier provides university-affiliated users the ability to connect to ScienceDirect from remote locations.[11]  Elsevier accomplishes this by (1) verifying that a user is an authorized university student or faculty member, and then (2) authenticating the user's computer as permitted to access ScienceDirect through that university's subscription.[12]  Once authorized, a user's ability to remotely access ScienceDirect persists for a limited time, after which the user must re-authenticate.[13]  Initial authentication of a user's computer to connect to ScienceDirect may be accomplished either by connecting physically to the university's computing network (*i.e.*, on-campus), or by connecting to that network remotely through a university-provided proxy service.[14]

### C.  Defendant Library Genesis Project's Infringing Conduct

The Library Genesis Project operates the website "**libgen.org**," at which it hosts a massive repository of infringing content, together with a specialized search engine which allows its users to locate and download copies of pirated content.[15]  The Library Genesis Project claims to host approximately 1 million scientific and technical books, as well as 40 million scientific journal articles.[16]  Elsevier has investigated the Library Genesis Project and has verified that it

---

[11] *Id.* ¶ 10.

[12] *Id.* ¶¶ 11-14.

[13] *Id.* ¶ 11.

[14] *Id.* ¶¶ 13-14.

[15] *Id.* ¶ 15.

[16] *Id.* ¶¶ 19-20.

does, in fact, make available for download, at no cost and without Elsevier's permission, an array of Elsevier's copyrighted works.[17]

Perhaps in order to facilitate the creation of mirrors of the site and its repository, the Library Genesis Project makes available for download copies of its search databases.[18] Elsevier has investigated two of these databases – specifically those relating to technical books and scientific articles – and has identified more than 29,000 Elsevier imprint book titles and approximately 12 million articles with Elsevier branding that the Project presents as available for illegal distribution through its website.[19] In addition to Elsevier's copyrighted works, the Library Genesis Project appears to host millions of works belonging to other scientific, technical, and medical publishers.[20]

Elsevier has attempted to remove its copyrighted works from the Library Genesis Project's repository through the DMCA notice-and-takedown regime, but the combination of the massive volume of works, the constant addition of new copies of works, and the lack of effective response from Defendants has rendered the effort futile.[21] Elsevier has also brought this issue to the attention of the Public Interest Registry ("PIR"), the domain registry for the .org top-level domain.[22] Specifically, Elsevier asked for the relief requested herein (*i.e.*, the disabling of Sci-

---

[17] *Id.* ¶ 21.

[18] *Id.* ¶ 22.

[19] *Id.* ¶ 23.

[20] Declaration of Edward M. McCoyd, Esq., dated May 29, 2015, ¶¶ 5-7; Declaration of Christopher McKenzie, dated June 1, 2015 ("McKenzie Decl.") ¶ 5; Declaration of Karen Hawkins, dated April 14, 2015 ("Hawkins Decl.") ¶ 4.

[21] Doda Decl. ¶ 10.

[22] Declaration of Joseph V. DeMarco, dated June 5, 2015 ("DeMarco Decl.") ¶ 5.

6

Hub.org) on the grounds that Sci-Hub.org's conduct violated PIR's Terms of Use.[23]  PIR,
however, did not address the violation of this Policy, but instead indicated it would comply with
a valid court order directed to it for such relief.[24]  Elsevier has also attempted to work with
subscriber universities to address this problem at the technical level, but the number of
universities involved, and their differing levels of expertise and responsiveness, have severely
limited the effectiveness of these efforts.[25]

        The Library Genesis Project is far and away the most voluminous repository of
unlawfully obtained and distributed scientific materials that Elsevier has ever encountered.[26]
Elsevier's investigation has revealed that a substantial portion of the entire corpus of
ScienceDirect content is being made available through the Library Genesis Project's website.[27]
Elsevier's analysis of the Library Genesis Project's bibliographic database indicates that
Defendants are pirating approximately 3,500 Elsevier-published works per day.[28]  Moreover,
Elsevier has been unable to identify any significant non-infringing purpose for the site, nor has it
been able to locate any statement by any purported operator of the site which would indicate a
legitimate purpose to the site.[29]  The Library Genesis Project profits from its infringing activities
through the collection of donations from its users, which it accepts in the form of Bitcoin.[30]

---

[23] *Id.*

[24] *Id.* ¶ 6.

[25] Woltermann Decl. ¶ 50.

[26] *Id.* ¶ 16.

[27] *Id.* ¶¶ 21, 23-24.

[28] *Id.* ¶ 25.

[29] *Id.* ¶ 29; McKenzie Decl. ¶ 5; Hawkins Decl. ¶ 4.

[30] Woltermann Decl. ¶ 28.

### D.       Library Genesis Project Mirrors

As noted above, the Library Genesis Project appears to encourage its users to make copies of the infringing content stored on its servers so as to facilitate further infringing activity.[31]  Elsevier has been able to identify several other domains, including **elibgen.org**, **libgen.info**, **lib.estrorecollege.org**, and **bookfi.org**, which direct visitors to websites which act as "mirrors" of the Library Genesis site.[32]  Visitors to these domains are typically given access to a search engine which appears to provide access to the Library Genesis Project's repository or a copy thereof.[33]  In so doing, these mirror sites perform substantially similar infringing functions as does the Library Genesis Project's "official" website and serve to amplify the already massive infringement of copyrighted works.

### E.       Defendant Sci-Hub's Unauthorized Access to ScienceDirect
###          and Infringing Conduct

Defendant Sci-Hub operates the website **Sci-Hub.org**, which enables its users to unlawfully obtain copyrighted scientific works from a number of commercial repositories of STEM materials, including ScienceDirect.[34]  Sci-Hub accomplishes this goal by obtaining compromised student credentials to university proxy servers and using those stolen credentials to authenticate access to ScienceDirect.[35]  Sci-Hub users who request an article or book from ScienceDirect may be granted access to ScienceDirect through a Sci-Hub proxy.[36]  Because Sci-

---

[31] *Id.* ¶ 22.

[32] *Id.* ¶ 30.  These mirrors may use copies of the search database obtained from the Library Genesis Project, as discussed *supra*, at Section II. C.

[33] *Id.*

[34] *Id.* ¶ 37.

[35] *Id.* ¶¶ 50-51.

[36] *Id.* ¶ 42.

Hub has authenticated its access to ScienceDirect using a subscribing university's computing systems, the Sci-Hub user is able to download the requested work at no cost, exactly as if he or she were a student at the compromised university.[37]

As noted above, Elsevier has, since its discovery of Sci-Hub's unlawful intrusion onto its ScienceDirect servers and the computing systems of its subscriber universities, worked with universities to prevent Sci-Hub's intrusions.[38]  Elsevier's efforts in this regard were partially successful with respect to certain universities, but the number of compromised universities and differing levels of engagement and technical expertise meant that the ongoing and growing infringements via the intrusions could not be completely stopped.[39]  In addition, Sci-Hub adopted increasingly sophisticated intrusion techniques that have rendered these efforts futile.[40]

Sci-Hub makes no pretenses as to the legitimacy of its infringing activities. Rather, Sci-Hub, through its Twitter account and through statements made on the Sci-Hub.org website, often boasts of the immense scale of its unlawful acts.[41]  *According to Sci-Hub's own statements, it is obtaining a newly pirated scientific book or journal article approximately once every 1.5 seconds, 24 hours per day, 7 days per week.*[42]

---

[37] *Id.*

[38] *Id.* ¶ 50.

[39] *Id.*

[40] *Id.* ¶ 53.

[41] Declaration of David M. Hirschberg, dated June 11, 2015 ("Hirschberg Decl."), ¶ 3, Exhibits A, B, and F.

[42] Woltermann, ¶ 48.

Sci-Hub monetizes its piracy and hacking scheme through user donations.[43]  Sci-Hub appears to have used these donations, at least in part, to purchase students' access credentials to their university computing systems.[44]

### F.    Sci-Hub's Cooperation with the Library Genesis Project's Infringements

In the course of its investigation into the Defendants' activities, Elsevier learned that, at some point, Sci-Hub began populating the Library Genesis Project with copies of the articles it was obtaining from intrusions into Elsevier and other publishers' databases.[45]  As a result, when a user searches for content on Sci-Hub using a unique identifier, Sci-Hub now only provides its users with content as described section I.E, *supra*, if the content is not already available from the Library Genesis Project's repository.[46]  If, however, a Sci-Hub user searches for a copyrighted work already stored in the Library Genesis Project repository using a unique identifier, Sci-Hub will instead retrieve that content from the Library Genesis Project rather than obtain a "new" infringing copy from ScienceDirect (or, as applicable, a platform operated by another STEM publisher).[47]  Defendants show no signs of stopping their massive piracy scheme absent compulsion; indeed, Sci-Hub's stated goal is to continue to contribute pirated works to the Library Genesis Project so that the growing illegal repository can become a more complete source of pirated materials and in the process, a substitute for legal sources of the content.[48]  Through this symbiosis, Sci-Hub and the Library Genesis Project act in concert to orchestrate a

---

[43] *Id.* ¶ 47.

[44] *Id.* ¶ 51.

[45] Hirschberg Decl. ¶ 3, Exhibit F (VK posting dated June 2, 2015).

[46] Woltermann Decl. ¶¶ 44-45.

[47] *Id.* ¶ 44.

[48] *Id.* ¶ 48.

complex, efficient scheme to pirate a substantial portion of the world's published scientific materials to the detriment of Elsevier, other STEM publishers, and, as described below, the scientific community and public at large.

### G.    Alexandra Elbakyan's Operation of Sci-Hub

Although the Sci-Hub.org website is registered anonymously, there is strong evidence to suggest that Alexandra Elbakyan, a resident of Almaty, Kazakhstan, is one of, if not the primary, operator of Sci-Hub.  In addition, Elbakyan may also be substantially involved in the operation of the Library Genesis Project or one of its mirrors.  According to her biography on the website lifeboat.com, Elbakyan is a graduate of the Kazakh National Technical University in Almaty, Kazakhstan, where she specialized in information security.[49]

Social media profiles associated with Sci-Hub strongly suggest Elbakyan's involvement.  Sci-Hub's profile on Copiny (a Russian-language business networking site) lists Elbakyan as Sci-Hub's creator.[50]  Elbakyan maintains Sci-Hub's presence on VK (a Russian social networking site).[51]  In a May 31, 2015, posting to the Sci-Hub VK page, Elbakyan expressly states that she is the founder, operator, and programmer of Sci-Hub.[52]  In addition, Sci-

---

[49] Hirschberg Decl. ¶ 5, Exhibit H.  According to its website, "The Lifeboat Foundation is a nonprofit nongovernmental organization dedicated to encouraging scientific advancements while helping humanity survive existential risks and possible misuse of increasingly powerful technologies, including genetic engineering, nanotechnology, and robotics/AI, as we move towards the Singularity." About the Lifeboat Foundation, *at lifeboat.com/ex/about*.  Elbakyan is listed as a member of Lifeboat's "Engineering Board."  Lifeboat Foundation Advisory Boards, *at lifeboat.com/ex/boards*.

[50] *Id.* ¶ 3, Exhibit D.

[51] *Id*., Exhibit E.

[52] *Id.* Exhibit F (VK posting dated May 31, 2015).

Hub's Twitter account, which often describes Sci-Hub's infringing activities, follows exactly one Twitter user: Elbakyan.[53]

Elbakyan has registered two websites in her own name (*i.e.*, without using WHOIS anonymization services): www.sci-hub.us and lib.gen.in.[54] Although as of the time of this filing, neither of these domains directs to a website engaging in piracy, the choice of names may indicate the intention to use them for such purposes in the future. The WHOIS records for these domain names provide the email address mindwrapper@gmail.com for Elbakyan and indicate a mailing address of Teslenko, 172, Almaty, Kazakhstan 050014.[55] A search of public records indicates that the street in Almaty formerly known as "Teslenko" has since been renamed "Zhumabaeva."[56]

## II.  **ARGUMENT**

Elsevier seeks a preliminary injunction and an order disabling Defendants' domain names under Federal Rule of Civil Procedure 65(b), the Copyright Act, 17 U.S.C. § 502, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), the All-Writs Act, 28 U.S.C. § 1651, and the Court's inherent authority to provide equitable relief when required to prevent the compounding of ongoing harm to the Plaintiff. For the foregoing reasons, Elsevier's requested relief should be granted.

---

[53] *Id.*, ¶ 6, Exhibit I; ¶ 3, Exhibit F.

[54] *Id.* ¶ 7, Exhibit J.

[55] *Id.*

[5656] *Id.* ¶ 8, Exhibit K. Elbakyan's social media postings indicate she may currently be a resident of Russia. (Hirschberg Decl. ¶ 3, Exhibit F (VK posting dated May 31, 2015).) We have not, however, been able to locate any physical address for Elbakyan other than that in Almaty, Kazakhstan.

A.      **Plaintiffs are Entitled to a Preliminary Injunction Enjoining Defendants'
        Infringing Acts and Disabling Defendants' Domain Names**

Section 502(a) of the Copyright Act provides that a court may "grant temporary
and final injunctions on such terms at it may deem reasonable to prevent or restrain infringement
of a copyright." This Court also has authority to enjoin the conduct of Defendant Sci-Hub
pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g).

To obtain a preliminary injunction, a party must demonstrate that: (1) it is likely
to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary
relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.
*Winter v. Natural Res. Def. Council, Inc*., 129 S. Ct. 365, 374 (2008). In the context of a
copyright claim, a "preliminary injunction is appropriate when: (1) the plaintiff demonstrates
either a likelihood of success on the merits or sufficiently serious questions going to the merits
and a balance of hardships tipping decidedly in the plaintiff's favor; (2) the plaintiff
demonstrates that he is likely to suffer irreparable injury in the absence of an injunction; (3) the
balance of hardships between the plaintiff and defendant tips in the plaintiff's favor; and (4) the
"public interest would not be disserved by the issuance of a preliminary injunction." *WPIX Inc.
v. ivi Inc.*, 765 F.Supp.2d 594, 601 (S.D.N.Y. 2011) (citing *Salinger v. Colting*, 607 F.3d 68, 79-
80 (2d Cir. 2010)); *see also*, *Getty Images (US), Inc. v. Microsoft Corp.*, No. 14-cv-7117, 2014
WL 5285697, at *3 (S.D.N.Y. Oct. 16, 2014). As set forth below, all four of these factors weigh
strongly in Plaintiff's favor.

13

1.      **Elsevier is Likely to Succeed in its Copyright Claims against Defendants**

To prevail on their copyright claims, Plaintiffs must prove, *inter alia*, "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in § 106." *Getty Images (US) v. Microsoft Corp.*, No. 14-cv-7114, 2014 WL 6633032, at *2 (S.D.N.Y. Nov. 24, 2014) (citing *Arista Records LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010).  Among these exclusive rights are reproduction and distribution. 17 U.S.C. § 106.  For purposes of infringement analysis, exclusive licensees are regarded as copyright owners.  *See, e.g.*, *Morris v. Business Concepts, Inc*., 259 F.3d 65, 70 (2d Cir. 2001), 17 U.S.C. § 201(d)(2).

Plaintiffs are likely to succeed on their copyright claims.  Elsevier is either the owner or exclusive licensee of the copyrights in the vast majority of the works it distributes through its ScienceDirect platform.[57]  Moreover, Elsevier is the owner of a substantial number of federally-registered copyrights in the works distributed through the ScienceDirect platform, including many of those unlawfully made available through Defendants' websites.[58]

As to Defendant Library Genesis Project, Plaintiffs have reviewed databases enumerating the works that the Library Genesis Project makes available through its repository and have confirmed that the databases list millions of Plaintiffs' copyrighted works.[59]  Plaintiffs have verified Defendants' infringing activities by downloading several Elsevier-published works

---

[57] Doda Decl. ¶ 6.

[58] *Id.* ¶¶ 7, 11-13.

[59] Woltermann Decl. ¶¶ 23-24.

14

from the Library Genesis Project and verifying that the files are substantially identical to Elsevier's copyrighted works legally available through ScienceDirect.[60]  Other major STEM publishers have also observed similar infringements of their copyright-protected works facilitated by Defendants.[61]

### 2.    Elsevier is Likely to Succeed in its CFAA Claim against Sci-Hub

The Computer Fraud and Abuse Act ("CFAA") prohibits the actions of an entity which "intentionally accesses a computer without authorization … and thereby obtains information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  In addition, the CFAA prohibits the actions of one who "knowingly and with intent to defraud, accesses a protected computer without authorization … and by means of such conduct furthers the intended fraud and obtains anything of value."  18 U.S.C. § 1030(a)(4).

For purposes of the CFAA, a "protected computer" includes any computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States."  18 U.S.C. § 1030(e)(2)(B).  Civil remedies are available to any person who suffers economic damage in an amount exceeding $5,000 as a result of a CFAA violation and may obtain compensatory damages and injunctive or other equitable relief.  18 U.S.C. § 1030(g).

The computing systems from which Elsevier's ScienceDirect platform are "protected computers" under the CFAA because they are designed and function to distribute

---

[60] Doda Decl. ¶¶ 12, 13.

[61] McKenzie Decl. ¶ 5; Hawkins Decl. ¶ 4.

copyrighted works, for a fee (either through subscription or a-la-carte purchases), through interstate commerce.[62] Defendant Sci-Hub intentionally accesses the ScienceDirect platform without authorization through its use of stolen access credentials.

Sci-Hub's ongoing unauthorized access to ScienceDirect has caused, and continues to cause, significant economic loss to Elsevier in an amount far in excess of $5,000. Sci-Hub has likely used its unauthorized access to ScienceDirect to obtain thousands, if not millions, of Elsevier's copyrighted works therefrom, and, in the majority of cases, each of these works has a value of between $19.95 and $41.95.[63] Moreover, Sci-Hub's unauthorized access to ScienceDirect is intrinsically linked to Sci-Hub's ongoing identity fraud targeting the university students whose access credentials Sci-Hub misappropriates. Accordingly, Elsevier is likely to succeed on its CFAA claim.

### 3. Defendants' Conduct Causes Irreparable Harm to Elsevier

Defendants' infringing activities irreparably harm Elsevier and the public. No monetary remedy conceivably recoverable in this action could repair the harm which will be endured by Elsevier should the Defendants be permitted to carry on their unlawful scheme through their websites.

In order to obtain a preliminary injunction in a copyright case, in addition to making out a *prima facie* case of infringement, "Plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger*, 607 F.3d at 82, *see also Citibank, NA v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985) ("Perhaps the

---

[62] Woltermann Decl. ¶¶ 5, 59.

[63] *Id.* ¶ 5.

single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.") (citations omitted).

Plaintiffs have suffered and will continue to suffer irreparable harm as the result of Defendants' ongoing infringement for a number of reasons. As a preliminary matter, Plaintiff will suffer irreparable harm because, should an injunction not issue, Plaintiff will, solely on the basis of Defendants' continued massive infringement during the course of these proceedings, be entitled to damages far in excess of Defendants' ability to pay. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1217 (C.D. Cal. 2007) ("Because it is extremely unlikely that (defendants) will be able to compensate Plaintiffs monetarily for the infringements it has induced in the past, or the infringements it could induce in the future … Plaintiffs have and will continue to suffer irreparable harm"), *see also Arista Records LLC v. Lime Wire LLC*, No. 06 CIV. 05936, 2010 WL 10031251 ("Arista Records"), at *3 (S.D.N.Y. Aug. 9, 2010) ("Plaintiffs face irreparable harm because it is virtually certain that they will be entitled to an enormous damage award after trial that will far exceed Lime Wire's ability to pay."); *Salinger*, 607 F.3d at 81 ("Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer. . . . And courts have tended to issue injunctions in [the copyright] context because to prove the loss of sales due to infringement is ... notoriously difficult.") (internal quotations omitted); *WPIX*, 765 F.Supp.2d at 617 (same).

In this action, Plaintiffs seek statutory damages under the Copyright Act for Defendants' unlawful infringement of their works. Given (1) the brazenness of Defendants' actions, (2) their own statements detailing their knowledge that their actions are infringing, (3)

17

their encouragement of their users to participate in their infringement, and (4) the massive scale

of their piracy operation, a finding that Defendants' infringement is willful is almost inevitable.

*See Branch v. Ogilvy & Mather Inc.*, 772 F.Supp. 1359, 1364 (S.D.N.Y. 1991) (finding of

willfulness requires showing defendant knew or should have known actions constitute

infringement), *see also Grokster*, 518 F.Supp.2d at 1217 (inducement can support finding of

willfulness), *Arista Records,* at *3 (same).  Accordingly, Plaintiffs will almost certainly be

entitled to statutory damages of up to $150,000 per infringed work.  17 U.S.C. § 504(c)(2).

Even if Plaintiffs are unable to show Defendants' conduct constitutes willful

infringement *and* Defendants can somehow prove they were entirely unaware of the unlawful

nature of their actions, Plaintiffs will be entitled to statutory damages in an amount no less than

$200 per infringed work.  *Id*.  Given, however, that the number of Plaintiffs' works being

infringed *per day* is likely greater than 10,000, these statutory damages would accrue at a rate

between approximately $2 million to $1.5 billion per day going forward.  As was the case in

*Grokster*, these damages are "so staggering" as to "very probably be well beyond" Defendants'

resources.  *Grokster*, 518 F.Supp.2d at 1217.

Defendants' actions also threaten imminent irreparable harm to Elsevier because

it appears that the Library Genesis Project repository may be approaching (or will eventually

approach) a level of "completeness" where it can serve as a functionally equivalent, although

patently illegal, replacement for ScienceDirect.  The Library Genesis Project already contains a

vast majority of the articles ScienceDirect users request most often, and Elsevier has already

observed that it is becoming increasingly difficult to find an article that Sci-Hub retrieves from

18

ScienceDirect rather than from the Library Genesis Project.[64]  Moreover, Sci-Hub's own statements indicate that it anticipates reducing its proxy activities in the near future as "in the future, there will no longer be any need to download most articles through the proxy, but simply from the library."[65]  Sci-Hub is currently pirating journal articles from ScienceDirect at a furious pace, and is thus drawing ever closer to the point where it can become an illegal commercial substitute for ScienceDirect.

*Finally*, Defendants' actions threaten irreparable harm to Elsevier because those actions could give rise to "viral infringement" – *i.e.*, that once the pirated works are "in the wild" on the Internet for free, Elsevier will be entirely unable to prevent third parties who have obtained unlawful copies of Elsevier's works from redistributing them to others.  Indeed, this Court has recognized that the loss of control due to viral infringement is a "potentially serious harm[]."  *WPIX*, 765 F.Supp.2d at 620; *see also* Arista Records, at *4 (characterizing infringement of digital music as capable of "spawn[ing] countless derivative infringing copies" which threatens "virtually unstoppable infringement of the copyright") (citing cases).

### 4.    The Balance of Hardships Tips Decidedly in Plaintiff's Favor

As set forth above, Plaintiffs have established the requisite likelihood of success on their Copyright and CFAA claims.  Nevertheless, should the Court have any concern regarding Plaintiffs' likelihood of success on the merits, Plaintiffs should still prevail in their application for a preliminary injunction because they have at least raised serious questions regarding the merits of their claims and that the balance of hardships tips heavily in their favor.

---

[64] Woltermann Decl. ¶ 21.

[65] *Id.* ¶ 48.

*See Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 738 (S.D.N.Y. 1993) ("A 'balance of the hardships tipping decidedly toward the party requesting preliminary relief' must be shown only when a movant fails to sufficiently demonstrate a likelihood of success on the merits, and can instead make out only 'sufficiently serious questions going to the merits to make them fair ground for litigation.'") (*citing ICN Pharmaceuticals*, 2 F.3d 484, 490 (2d Cir. 1993)), *see also MONY Group, Inc. v. Highfields Capital Mgmt, L.P.*, 368 F.3d 138, 143 (2d Cir. 2004) ("To secure a preliminary injunction in district court, the moving party must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.") (*quoting Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 149 (2d Cir.1999)); *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07 CIV. 9580, 2008 WL 594773, at *2 (S.D.N.Y. Mar. 5, 2008).

       For the same reasons that the Plaintiffs are likely to succeed on their claims, Plaintiffs have raised serious questions regarding the merits of their claims, making them fair ground for litigation. In addition, the balance of hardships is entirely in Plaintiffs' favor. Defendants' actions present a substantial threat to the survival of Plaintiffs' ongoing legitimate business in that, should the Defendants' infringing activities not be halted, their unlawful infringing library could conceivably become a substitute for ScienceDirect among scientific researchers. On the other hand, the harm to Defendants should an injunction issue will be negligible. *First*, it is axiomatic that Defendants have no legitimate interest in the illegal copying or redistribution of Plaintiffs' copyrighted works (or, for that matter, the copyrighted works of other publishers whose rights will also be protected by an injunction) or to continue to engage in

20

unauthorized computer access in violation of the CFAA.  *See* Arista Records, at *5 (noting that "massive scale of infringement through the Lime Wire client has caused great and irreparable injury and any harm to Lime Wire is far outweighed by that injury"); see also *WPIX*, 765 F.Supp.2d at 620-21 ("While it is a practical hardship for [defendant] to go out of business, it is not a legally recognized harm.  It is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product").  *Second*, to the extent that Defendants are deprived of the "donations" they obtain from users to support their illegal scheme – even assuming that Defendants have the right to such "donations" – that concern can be adequately remedied through Plaintiffs' posting of a bond.[66]

### 5.     Disabling Defendants' Domain Names and Issuing a Preliminary Injunction Will Serve the Public Interest

Beyond the protection of Elsevier's legitimate interests in the copyright in its works and in the security of its computer systems, an injunction disabling Defendants' domain names and barring further infringement will serve the public interest in three ways.

*First*, an injunction will protect the delicate ecosystem which supports scientific research worldwide.  The subscription and per-article fees charged by Elsevier and other STEM publishers are used to support the dissemination and discovery of scientific research, the creation of new journals in new fields of research, the maintenance of a definitive and accurate record of scientific discovery, and the academic tenure process.[67]

*Second*, an injunction will safeguard the quality of published scientific research and, in some cases, prevent harm to the safety or health of members of the public.  Elsevier and

---

[66] DeMarco Decl. ¶ 10.

[67] Doda Decl. ¶ 14.

other STEM publishers take significant steps to correct or retract scientific publications which are found to be flawed or erroneous.[68]  These corrections and retractions are reflected in the online databases – such as ScienceDirect – operated by those publishers.  Defendants, however, do not participate in this curation process, which will result in their repository's inclusion of erroneous or discredited research.  In the worst of all circumstances, these uncorrected errors could threaten the public health or safety.  For example, a medical article which contains a typographical error in a dosing chart for a new drug could, if uncorrected and relied upon by user of Defendants' services, result in the provision of dangerous or ineffective treatment to a patient.[69]  Elsevier has verified that in at least some cases, articles retracted from ScienceDirect remain accessible for distribution through Defendants' website with no indication that those articles have been retracted.[70]

Third, an injunction will protect universities and their students from being the victims of other forms of cyber-crime.  As discussed supra at II. D., Defendant Sci-Hub obtains access to university computer systems through compromised student credentials.  In at least some cases, Sci-Hub accomplishes this by paying for those credentials – itself a criminal act.[71]  While Plaintiffs are only aware of Defendants' criminal actions as they implicate the CFAA and the Copyright Act, a malicious actor in possession of such credentials can engage in a broad array of other crimes.  These include, but are not limited to, the deployment of malware or

---

[68] Id. ¶ 15.

[69] Id. ¶ 17.

[70] Id. ¶¶ 18-19.

[71] Woltermann Decl. ¶ 51.

botnets, the launching of attacks on third-party computer systems from the compromised

university system, and identity theft using personal information obtainable from those systems.[72]

       *Fourth*, an injunction protecting the Plaintiff's interest here will serve the public

by incentivizing the Plaintiff to continue to publish these copyrighted works.  As the Second

Circuit has stated, "The object of copyright law is to promote the store of knowledge available to

the public.  But to the extent it accomplishes this end by providing individuals a financial

incentive to contribute to the store of knowledge, the public's interest may well be already

accounted for by the plaintiff's interest."  *Salinger*, 607 F.3d at 82.

### 6. An Injunction Disabling Defendants' Domains Can Avoid Further Irreparable Harm to Elsevier

       Plaintiffs' application is directed toward Defendants' domains within the .org and

.info top-level domains, each of which is operated by an organization with a physical presence in

the United States.[73]  Defendants likely use these domains because .org and .info are analogous to

"prime real estate" in the physical world.  Quite simply, a typical user is more likely to be able to

find a website if it is hosted within the most popular top-level domains.  Moreover, in the case of

.org, which is operated by the Public Interest Registry, presence within the top-level domain can

give the Defendants' websites the appearance of legitimate, public-interest websites, rather than

the vehicles for overt and brazen copyright infringement and hacking which they actually are.[74]

       This Court should also issue an injunction disabling and preventing the transfer of

the Defendants' domain names because absent such an injunction, Plaintiffs are likely to be

---

[72] *Id.* ¶ 60.

[73] DeMarco Decl. ¶ 3.

[74] *Id.* ¶ 4.

deprived of any effective remedy.[75]  Although Plaintiffs seek monetary damages in this case, practical realities dictate that even if that remedy is granted, the relief will be far from sufficient to make Plaintiff whole.  If this Court ultimately finds in Plaintiffs' favor on the issue of infringement, the sheer number of Plaintiffs' works the Defendants' have infringed would call for an award far in excess of, and perhaps several orders of magnitude greater than, that which the Defendants will have the ability to pay.  Even if Defendants possessed substantial assets which could be used to satisfy a judgment against them, Plaintiffs have no reason to believe that Defendants, who are likely physically located in countries beyond the reach of this Court's enforcement power, would actually pay any meaningful portion of those damages.[76]

### 7.    The All Writs Act Authorizes the Court to Direct Registries to Disable Defendants' Domain Names

Plaintiff's proposed order directs third-party top-level domain registries to take steps to disassociate Defendants' domain names from the IP addresses of Defendants' websites, thus preventing Internet users from accessing those websites through the use of those domain

---

[75] Elsevier also requests that this Court issue an Order permitting Elsevier to cancel any redirections Defendants may have entered into Google's Webmaster Tools which could be used to divert search traffic for the Defendants' domain names to other URLs.  In this manner, Defendants would be unable to frustrate an order disabling the Defendants' domain names by smoothly transitioning their content to new domains.  *See* DeMarco Decl. ¶ 9.

[76] Courts in this District have issued preliminary relief disabling domains in the context of large-scale IP infringement involving overseas defendants.  *See True Religion Apparel v. Xiaokang Lei*, No. 11-cv-08242 (S.D.N.Y. Nov. 30, 2011) (Preliminary Injunction, at Dkt. 6) (disabling domain names of counterfeiters); *North Face Apparel v. Fujian Sharing Import & Export*, No. 10-cv-1630 (S.D.N.Y. Mar. 16, 2010) (Temporary Restraining Order, at Dkt. 15) (*ex parte* preliminary order disabling counterfeiters' domain names).  *See alsoPhillip Morris USA, Inc. v. Otamedia, Ltd.*, 331 F.Supp. 2d 228, 247 (S.D.N.Y. 2004) (modifying default judgment to transfer trademark infringer's domain names to plaintiff); *Pearson Educ. Inc. v. Nugroho*, No 08-cv-8034 (S.D.N.Y. Oct. 10, 2013) (order modifying permanent injunction, at Dkt. 53) (same); *Elsevier v. Kozlov*, No. 14-cv-2422 (S.D.N.Y. April 13, 2015) (Default Judgment and Permanent Injunction, at Dkt. 58) (granting plaintiff leave to move for supplemental relief, including domain name seizure, in the event that defendants violate terms of injunction prohibiting further infringement).  Other Districts have issued similar orders as preliminary relief in a variety of contexts.  *See, e.g., Chanel v. Liu Ling*, No. 10-cv-489 (E.D. Va. Oct. 7, 2010) (Temporary Restraining Order, at Dkt. 14) (*ex parte* order transferring counterfeiters' domain names to account in trust for the Court and redirecting domain to copy of complaint); *Microsoft v. Does*, No. 13-cv-139 (E.D. Va. Jan. 31, 2013) (Temporary Restraining Order, at Dkt. 23) (*ex parte* order disabling CFAA defendants' domain names).  .

names.  The All Writs Act provides that a court may issue any writ necessary or appropriate to effectuate the administration of justice.  28 U.S.C. § 1651(a).  This power extends to the issuance of writs directed to third-parties when necessary to implement a court order.  *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) ("The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice and encompasses even those who have not taken any affirmative action to hinder justice.") (internal citations omitted).

The top-level domain registries, as custodians of the .org and .info top-level domains, have the ability to remove the association between the Defendants' domain names and the Defendants' IP addresses.  The top-level domain registries for the .org and .info top-level domains have offices in the United States and are subject to this Court's jurisdiction. Furthermore, the Public Interest Registry has informed Plaintiffs that it will comply with a Court order directing it to disable Defendants' domain names.[77]

Finally, requiring that the top-level domain registries disable Defendants' domain names will not implicate Due Process concerns by imposing any substantial burden on the registries because changing the IP address associated with a domain name (or, similarly,

---

[77] DeMarco Decl. ¶ 6.  As noted above, Defendants have used overseas domain registration service providers who conceal Defendants' true identities.  These providers may not respect U.S. court orders.  Fundacion Private Whois, used by the Defendants to register sci-hub.org and bookfi.org, states that it will only comply with an order to compel the disclosure of personal information upon receipt of "a final judgment from a competent court of the Republic of Panama instructing us to do so."  *See Fundacion Private Whois Terms and Conditions*, *at* www.privatewhois.net (retrieved April 13, 2015).  Whois Privacy Corp., used by Defendants to register libgen.org, elibgen.org, libgen.info, and estrorecollege.org, states that it "*may in its discretion*, abide by court orders" issuing from any jurisdiction. *See Whois Privacy Service Agreement*, ¶ 5.c, *at* www.whoisprivacycorp.com/agreement (retrieved April 13, 2015) (emphasis added).

disabling the association between a domain name and an IP address) is a regular business practice of the top-level domain registries.[78]

### B.     Plaintiffs Should Be Permitted to Serve Defendants by E-mail

Elsevier respectfully requests that the Court approve and order alternate means of service on Defendants via e-mail.  Specifically, Elsevier has located e-mail addresses provided by some of the Defendants on their websites.[79]  Elsevier also requests that service be permitted through the e-mail addresses listed as the "Registrant Email" in the WHOIS records for the Defendants' websites.  Notice and service by the foregoing means satisfy Due Process, are appropriate, sufficient, and reasonable to apprise Defendants of this action, and are necessary under the circumstances.   Moreover, should this Court authorize service by e-mail, Elsevier will, so as to ensure the provision of comprehensible notice to those Defendants who may be Russian-speaking, serve all Defendants copies of the Complaint, Summons, and all motions or proposed orders in both English and Russian.[80]

*First*, legal notice and service by e-mail satisfies Due Process as it is reasonably calculated, in light of the circumstances, to apprise the interested parties of the temporary restraining order, preliminary injunction hearing, and lawsuit.  See *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Such methods are also authorized under Federal Rule of Civil Procedure 4(f)(3), which allows a party to serve defendants by any means not prohibited by international agreement, as the Court directs.  As this Court stated in *Philip Morris USA Inc. v. Veles Ltd.*:

---

[78] DeMarco Decl. ¶ 8.

[79] Woltermann Decl. ¶ 61.

[80] DeMarco Decl. ¶ 13.

> By design, Rule 4(f)(3) was adopted in order to provide flexibility and discretion to the federal courts in dealing with questions of alternative methods of service of process in foreign countries . . . . What constitutes appropriate service will vary depending upon the particular circumstances of the case. Under Rule 4(f), courts have permitted a wide range of alternative methods including email . . . . In each case, the court must determine whether the alternative method is reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Philip Morris USA Inc. v. Veles Ltd.*, No. 06-cv-2988, 2007 WL 725412, at *2 (S.D.N.Y. Mar. 12, 2007) (internal citations and quotations omitted). *See also United States v. Lebanese Canadian Bank,* 285 F.R.D. 262, 266 (S.D.N.Y.2012) ("The decision of whether to order service of process under Rule 4(f)(3) is committed to the sound discretion of the district court.") (quotations omitted)); *In re S. African Apartheid Litig.,* 643 F.Supp.2d 423, 433 (S.D.N.Y.2009) ("A court is afforded wide discretion in ordering service of process under Rule 4(f)(3).") (citation omitted)); *S.E.C. v. Antisevic,* No. 05 CV 6991, 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009) ("[Rule 4(f)(3)] provides the Court with flexibility and discretion empowering courts to fit the manner of service utilized to the facts and circumstances of the particular case." (citation omitted)); *F.T.C. v. PCCare247 Inc.*, No. 12 CIV 7189, 2013 WL 841037, at *2 (S.D.N.Y. Mar. 7, 2013) (same); *In GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 265 (S.D.N.Y. 2012) ("court-directed service under Rule 4(f)(3) is as favored as service under Rule 4(f)(1) . . . inasmuch as it is merely one means among several which enables service of process on an international defendant.") (internal quotations and citations omitted)). Moreover, "'[S]ervice of process under Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.' It is merely one means among several which enables service of process on an international defendant.'" *Ehrenfeld v. Salim a Bin Mahfouz*, No. 04 CIV. 9641, 2005 WL 696769, at *2 (S.D.N.Y. Mar. 23, 2005) (*quoting Rio Properties, Inc. v. Rio Int'l. Interlink*, 284 F.3d 1007,

1015 (9th Cir. 2002); *see also Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265

F.R.D. 106, 115 (S.D.N.Y.2010); *KPN B.V. v. Corcyra D.O.O.*, No. 08 CIV. 1549, 2009 WL

690119, at *1 (S.D.N.Y. Mar. 16, 2009).

      Indeed, the methods of notice and service proposed by Elsevier have been

approved in numerous cases, including in the Second Circuit, and particularly in cases such as

this, involving Internet-based misconduct, carried out by international defendants, and causing

immediate, irreparable harm.  As the Ninth Circuit observed:

> [Defendant] had neither an office nor a door; it had only a
> computer terminal.  If any method of communication is reasonably
> calculated to provide [Defendant] with notice, surely it is e-mail-
> the method of communication which [Defendant] utilizes and
> prefers.  In addition, e-mail was the only court-ordered method of
> service aimed directly and instantly at [Defendant] . . . .  Indeed,
> when faced with an international e-business scofflaw, playing
> hide-and-seek with the federal court, e-mail may be the only means
> of effecting service of process.

*Rio Properties, Inc.*, 284 F.3d at 1014-15.[81]  *See, e.g., Philip Morris USA Inc.*, 2007 WL 725412,

at *3 (*citing Rio Properties* and authorizing e-mail and fax as alternate means of service where

"defendants conduct business extensively, if not exclusively, through their Internet websites and

correspond regularly with customers via email.  Furthermore, defendants do not disclose their

physical addresses or location of incorporation"); *GMA Accessories, Inc., v. Megatoys, Inc.*, No.

01 Civ. 12743, 2003 WL 193507 (S.D.N.Y. Jan. 14, 2003) (permitting service by e-mail on

---

[81] *Rio Properties* has been followed and cited on numerous occasions in the Second Circuit, and in the Southern
District in particular.  *See, e.g., Ehrenfeld*, 2005 WL 696769, at *2; *Ryan*, 2002 WL 1628933, at *2; *Jian Zhang v.
Baidu.com, Inc.*, 293 F.R.D. 508, 511-12 (S.D.N.Y. 2013); *In GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 265
(S.D.N.Y. 2012); *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, No. 03 CIV. 8554, 2005 WL 1123755, at *4
(S.D.N.Y. May 11, 2005); *KPN B.V. v. Corcyra D.O.O.*, No. 08 CIV. 1549, 2009 WL 690119, at *1 (S.D.N.Y. Mar.
16, 2009).

foreign defendant in copyright infringement action); *see also Williams-Sonoma Inc. v. Friendfinder Inc.*, No. C06-06572, 2007 WL 1140639, at *1 (N.D. Cal. Apr. 17, 2007) (service by e-mail consistent with Hague Convention and warranted in case involving misuse of Internet technology by international defendants); *Popular Enterprises LLC v. Webcom Media Group. Inc.*, 225 F.R.D. 560, 563 (E.D. Tenn. 2004) (finding that service of process by e-mail was reasonably calculated to apprise e-commerce defendant of the action and give it an opportunity to respond); *In re Int'l Telemedia Associates*, 245 B.R. 713, 722 (N.D. Ga. 2000) (approving service by e-mail and facsimile and stating that "[a] defendant should not be allowed to evade service by confining himself to modern technological methods of communication not specifically mentioned in the Federal Rules. Rule 4(f)(3) appears to be designed to prevent such gamesmanship by a party."); *Chanel, Inc. v. Zhibine*, No. 2:09-cv-02835, 2010 WL 1009981, at *4 (W.D. Tenn. March 17, 2010) (granting alternate service of process by e-mail and stating that e-mail service has the "greatest likelihood" of reaching ecommerce merchants; indeed, "[t]he federal judiciary's own CM/ECF system alerts parties . . . by e-mail messages."). *See also Ryan v. Brunswick Corp.*, No. 02-CV-0133E(F), 2002 WL 1628933, at *2 (W.D.N.Y. May 31, 2002) (authorizing service of process on international defendant through e-mail address listed on its website); *Williams v. Advertising Sex LLC*, 231 F.R.D. 483, 488 (N.D. West Va. 2005) (authorizing e-mail service); *Chanel, Inc. v. Zhixian*, No. 10-CV-60585, 2010 WL 1740695, at *3 (S.D. Fla. April 29, 2010) (e-mail service "reasonably calculated to notify Defendants of the pendency of this action and provide him with an opportunity to present objections."); *Chanel, Inc. v. He Zhizhong*, No. 09-2818, 2010 WL 985195, at *2 (W.D. Tenn. March 16, 2010) (authorizing e-mail service); *AllscriptsMisys. LLC v. Am. Digital Networks, LLC*, 2010 U.S. Dist. LEXIS 4450, *3 (D. Md. 2010) (granting *ex parte* TRO and order promoting "notice of this

Order and Temporary Restraining Order as can be effected by telephone, electronic means, mail or delivery services").

In this case, the email addresses listed as the "Registrant Email" in the WHOIS records for the Defendants' websites, as well as the email addresses available (or previously available) on the actual websites at issue here, are likely to be the most accurate and viable contact information and means of notice and service.[82]  Moreover, Defendants will expect notice regarding their use of the privacy protect organizations' services by those means, as Defendants agreed to such in their agreements with these service providers.  *See Nat'l Equip. Rental, Ltd. V. Szukhent*, 375 U.S. 311 (1964) ("And it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether.").  Specifically, both of the privacy protect organizations at issue here – Fundacion Private Whois ("Fundacion", used by Defendants to register sci-hub.org and bookfi.org) and Whois Privacy Corp. ("WPC", used by Defendants to register libgen.org, elibgen.org, libgen.info, and estrorecollege.org) – state in their terms that they are to be contacted by e-mail only, and that they agree to forward such e-mail correspondence to domain owners.  *See* Fundacion Terms and Conditions, *available at* www.privatewhois.net ("Fundacion Private Whois is immediately and without any filtering or human intervention forwarding all emails sent to the listed public Whois contact to your chosen email addresse(s) . . . Fundacion Private Whois will simply discard or reject all physical mail we may receive on your behalf."); *see also* WPC Contact Us page, *available at* www.whoisprivacycorp.com ("If you

---

[82] The specific e-mail addresses to be served for each Defendant are listed in Elsevier's proposed order.

30

need to contact an owner please send an email to the email address you found in the public whois."). [83]

     *Finally*, even were we to assume that certain Doe Defendants were physically located in Russia, it bears noting that although the United States and Russia are both signatories to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (the "Hague Convention"), Article 1 of the Hague Convention specifically states that "[the] convention shall not apply where address of the person to be served with the document is not known." *See Prediction Co. LLC v. Rajgarhia*, No. 09 CIV.7459, 2010 WL 1050307, at *2 (S.D.N.Y. Mar. 22, 2010) (Hague Convention inapplicable although country at issue, India, was a signatory, because Defendant's address was unknown to Plaintiff). As the addresses of the Defendants here, with the exception of Defendant Elbakyan, are unknown, the Hague Convention does not apply in this case either. [84] With respect to Defendant Elbakyan, Elsevier has been able to locate a physical address for this Defendant in Almaty, Kazakhstan. While Elsevier intends to, with the Court's approval, also serve Elbakyan via e-mail, it will of course also attempt service by postal mail at this physical address.

     Elsevier's counsel has researched whether the issuance of the requested service order pursuant to Rule 4(f)(3) is contrary to or likely to offend the laws of Kazakhstan. [85] The laws of Kazakhstan do not appear to prohibit the service of process by e-mail or by postal mail

---

[83] DeMarco Decl. ¶ 12.

[84] It also bears noting that, though it does not expressly authorize e-mail service, the Hague Convention does not preclude e-mail service, and thus, is no bar to court-directed e-mail service under Rule 4(f)(3). *Ehrenfeld*, 2005 WL 696769, at *2 (S.D.N.Y. Mar.23, 2005); *Advanced Aerofoil Technologies, AG v. Todaro*, No. 11 CIV. 9505, 2012 WL 299959, at *1 (S.D.N.Y. Jan. 31, 2012); *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, No. 03 CIV.8554, 2005 WL 1123755, at *4 (S.D.N.Y. May 11, 2005); *Rio Properties,* 284 F.3d at 1014; *Williams-Sonoma Inc. v. Friendfinder Inc.*, No. C06-06572, 2007 WL 1140639, at *2 (N.D. Cal. Apr. 17, 2007).

[85] DeMarco Decl. ¶ 11. Kazakhstan is *not* a signatory to the Hague Convention.

from the United States;[86] thus, Elsevier submits that allowing service of process upon Defendant in this case via e-mail and by postal mail would not be inconsistent with the laws of Kazakhstan.

For all the foregoing reasons, notice and service by e-mail are warranted and necessary here.

## **CONCLUSION**

For the reasons set forth herein, Elsevier respectfully requests that this Court grant its motions (1) for a TRO and order to show cause regarding a preliminary injunction, and (2) permitting notice of the preliminary injunction hearing and the Complaint to be served upon Defendants by alternative means.

Dated: New York, New York
      June 11, 2015

           DEVORE & DEMARCO LLP

           By:   /s/ Joseph V. DeMarco   
               Joseph V. DeMarco (JVD-3499)
               David M. Hirschberg
               Urvashi Sen
               99 Park Avenue – Suite 1100
               New York, New York 10016
               (212) 922-9499
               jvd@devoredemarco.com

               *Attorneys for Plaintiff Elsevier Inc., Elsevier B.V., and Elsevier Ltd.*

---

[86] *Id.*